**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARCIA EISENHOUR,

     Plaintiff - Appellant,

v.

WEBER COUNTY, a political subdivision
of the State of Utah; CRAIG D. STOREY;
CRAIG DEARDON; KENNETH
BISCHOFF; JAN ZOGMAISTER, in their
official and individual capacities,

     Defendants - Appellees.

_____

MARCIA EISENHOUR,

     Plaintiff - Appellee,

v.

CRAIG D. STOREY,

     Defendant - Appellant,

and

WEBER COUNTY, a political subdivision
of the State of Utah; CRAIG DEARDON;
KENNETH BISCHOFF; JAN
ZOGMAISTER, in their individual and
official capacities,

     Defendants.

_____

No. 17-4015

No. 17-4018

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:10-CV-00022-CW)**

_____

April Hollingsworth, Hollingsworth Law Office, LLC, Salt Lake City, Utah for Plaintiff-Appellant.

Susan Black Dunn, Dunn & Dunn, P.C., Salt Lake City, Utah, for Defendant-Appellees (W. Lewis Black, Dunn & Dunn, P.C., Salt Lake City, Utah, on the briefs)

Linette Bailey Hutton, Hutton Law Associates, Salt Lake City, Utah for Defendant-Appellee, Craig D. Storey.

_____

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Marcia Eisenhour worked for 24 years as a court administrator for the Weber County Justice Court. In 2008, when her supervisor was Judge Craig Storey, the only judge of that court, she complained to the county attorney about sexual harassment by Storey. The matter was referred to Utah's Judicial Conduct Commission, which found no misconduct. Eisenhour then went public in 2009, and the press reported her allegations. Several months later, three Weber County Commissioners—defendants Craig Deardon, Kenneth Bischoff, and Jan Zogmaister—voted to close the Justice Court and merge it with a similar court in another county. This eventually left Eisenhour without a job.

Eisenhour sued Storey, Weber County, and the three commissioners who voted to close the Justice Court, raising a variety of claims. The district court granted summary

2

judgment against Eisenhour on all claims, and she appealed. This court reversed in part. Relevant to this appeal, we held that Eisenhour had presented enough evidence to support (1) her claim under § 1983 against Storey for sexually harassing her in violation of her right to equal protection and (2) her claim against the County and the three commissioners under 42 U.S.C. § 1983, alleging that they retaliated against her for exercising her First Amendment free-speech rights by closing the Justice Court and depriving her of a job. *See Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1235–36 (10th Cir. 2014). We also remanded for trial her claim under the Utah Whistleblower Act against the County (there was no whistleblower claim against the commissioners), *see id.,* but no issues relating to that claim are raised on this appeal.

At the trial on the remanded claims, the jury rendered verdicts for Eisenhour on the equal-protection harassment claim against Storey and the whistleblower claim against the County but found against her on the First Amendment retaliation claims against the County and the commissioners. The district court then granted a motion by the County for a new trial on the whistleblower claim, and it sua sponte ordered a new trial on the retaliation claims against the County and the commissioners. At the retrial on those claims the court granted the commissioners' motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) on the retaliation claim against them, and the jury found for the County on the whistleblower and retaliation claims against it.

After Eisenhour and Storey appealed, we consolidated the two appeals for decision. Storey raises two issues on appeal: (1) the denial of his motion for judgment as a matter of law because the evidence against him was insufficient, and (2) the admission

3

into evidence of a poem he had written concerning Eisenhour. Eisenhour raises three contentions with respect to the judgments in favor of the County and the commissioners: (1) the judge who presided at the first trial should have recused himself after the jury rendered its verdict in that trial, (2) her second trial was unfair because of the district court's evidentiary rulings, and (3) at the second trial the district court should not have granted the commissioners a judgment as a matter of law but should have let the claim go to the jury. With respect to her claims against Storey, she contends that the district court should not have set aside the jury's assessment of economic damages against Storey for the loss of her job and should not have dismissed her punitive-damages claim. We reject all challenges by both parties except the dismissal of the punitive-damages claim.

## I. STOREY'S APPEAL

### A. Sufficiency of Evidence of Equal-Protection Claim

The jury at the first trial rendered a verdict in favor of Eisenhour on her sexual-harassment equal-protection claim against Storey. He unsuccessfully moved for judgment as a matter of law. He now appeals the denial of that motion, contending that there was insufficient evidence to establish that his conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment." Storey 1st Br. at 21. In his view, "The evidence shows that no other employee of the Justice Court found any conduct attributable to [him] severe, pervasive, humiliating, physically threatening, hostile or abusive." *Id.* at 22. "Rather," he argues, "the witnesses found it was . . . Eisenhour's conduct that created a hostile and abusive work environment." *Id.*

4

For us to adopt this argument, however, we would have to disregard Eisenhour's testimony. She testified as follows: Storey's harassment began when he handed her, albeit for the purported purpose of filing, the erotic poem that he wrote about her. His misconduct escalated after that point and he began making physical contact with her. He would either come up behind her when she was sitting at her desk and press his groin into the back of her head or come up to her at the front counter and stand close enough that his groin touched her thighs. On one occasion Storey had her come into his office and he proceeded to tell her about a dream of his in which she was at work naked from the waist up. In addition, Storey, who served as her direct supervisor, became possessive of her after learning that she and her husband had separated. He began asking her co-employees about her activities and began placing restrictions on when she could use leave time (that is, only after informing him where she intended to go, whom she intended to go with, and what she intended to do).

Storey asserts that it was Eisenhour who created a hostile or abusive environment. In support of this assertion, he cites only to the testimony of Eisenhour's co-worker Amanda Shipley, who testified about the atmosphere in the office. But the office atmosphere in general has little to do with how Storey treated Eisenhower. And in any event, a review of Shipley's testimony reveals that her complaints about the working environment all appear to postdate Storey's harassment of Eisenhour and virtually all relate to the period after Eisenhour complained to County officials about Storey's conduct and County officials took steps to minimize the contact between Eisenhour and Storey. Thus, contrary to establishing that it was Eisenhour who created a hostile or

abusive working environment, Shipley's testimony indicates that it was Storey's conduct, and the County's response to it, that caused the difficult working environment for the other employees of the Justice Court.

Considering the evidence as a whole, the jury could have reasonably found, and indeed did find, that Storey's actions created an objectively hostile or abusive working environment for Eisenhour.

## B.  Admission of Storey's Poem Into Evidence

Storey's other argument on appeal is that the district court erred in admitting his poem about Eisenhour into evidence.  He argues (1) that the poem was irrelevant to Eisenhour's claims; (2) that there was insufficient evidence to support the district court's finding that Eisenhour discovered the poem in 2007 (we will discuss why the timing matters below); and (3) that Federal Rule of Evidence 403 barred admission of the poem because of its potential to cause unfair prejudice.

These challenges to admission of the poem may well be barred under the law-of-the-case doctrine because this court implicitly ruled in the first appeal that the poem was relevant when we relied in part on the poem to hold that there was sufficient evidence to support Eisenhour's claim.

In any event, admission of the poem was not reversible error.  We review decisions to admit evidence for abuse of discretion.  *See United States v. Boeing Co.*, 825 F.3d 1138, 1145 (10th Cir. 2016).  "Under this standard, we will not reverse unless the district court's decision exceeded the bounds of permissible choice in the circumstances or was arbitrary, capricious or whimsical."  *Id.* (internal quotation marks omitted).

6

Storey's first point is mistaken; the poem was relevant. He suggests that "there is absolutely no evidence that [the poem] was intended to harass or discriminate against [Eisenhour]." Storey 1st Br. at 16. But it reveals Storey's strong sexual feelings toward her, which could provide a motive for his conduct, making it more likely that the improper touching was intentional rather than accidental.

We are also unpersuaded by Storey's contention about the date of the poem's discovery. Although Eisenhour testified that she found the poem in April 2007, Storey argues that the evidence establishes that Eisenhour discovered the poem in April 2004, making its temporal connection to the alleged misconduct too remote for it to be relevant. But even if, as Storey asserts, her testimony was against the weight of the evidence, the district court could certainly leave for the jury to decide the accuracy of her testimony about the date of discovery. *See* Fed. R. Evid. 104(b); 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 104.30, at 104-47 (2d ed. 1997) ("In deciding preliminary issues under Rule 104(b), the judge must determine only that a reasonable jury could make the requisite factual determination based on the evidence before it."). We note that in response to a special interrogatory, the jury found that Eisenhour discovered the poem in 2007.

Turning to Storey's Rule 403 argument, the pertinent part of the rule states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th

7

Cir. 2000) (internal quotation marks omitted). "Exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006) (internal quotation marks and brackets removed). "The district court is clearly in a superior position to perform this analysis, and thus is accorded broad discretion in making such decisions." *Deters*, 202 F.3d at 1274. We see no abuse of discretion in the district court's Rule 403 ruling. Certainly the poem's introduction harmed Storey's defense, but the rule's concern is only *unfair* prejudice, and we have already noted that the poem was relevant. Given the strong preference for admitting relevant evidence, the district court's decision must stand.

## II. EISENHOUR'S APPEAL

### A. Judgment in Favor of County and Commissioners

#### 1. Motions to Disqualify Judge Waddoups

Although he was not the judge who had granted summary judgment to the defendants, Judge Clark Waddoups presided at both trials. Eisenhour filed two motions to disqualify Judge Waddoups from proceeding after the jury verdict at the first trial— one was decided by Judge Waddoups in August 2015, and a second by Judge David Sam in October 2016. We review district-court denials of motions to recuse or disqualify for an abuse of discretion. *See Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1308 (10th Cir. 2015).

Both motions relied on the same factual predicate—an offhand comment by Judge Waddoups. The context was as follows: At the close of Eisenhour's evidence at the first

8

trial, the defendants moved for directed verdicts. Discussing the motion outside the jury's presence, Judge Waddoups expressed doubt about the sufficiency of Eisenhour's evidence but nevertheless allowed the claims to go to the jury. We quote what he said, emphasizing the challenged comment:

> I have serious questions about whether or not the plaintiff has stated enough—presented enough evidence. As I understand Rule 50, I can reserve making that final decision until after I see how the jury verdict [*sic*] rules. And I think for pragmatic reasons to protect the rights of everyone so that this doesn't have to be done again, the best course of action is for me to allow the jury to decide this issue. . . .

> \* \* \*

> I want to make it clear that I am reserving the right to take this away from the jury if they enter a verdict because I have serious questions about whether this evidence is sufficient. *If the jury finds that there is no cause of action, we're all better off.* If the jury finds that there's a cause of action and awards some damages, then I'll allow you to re-brief and argue the question as to whether, as a matter of law, this jury—whether the verdict, if it's entered, should be taken from the jury. I think it is, at best, a very, very close case. I have serious questions as to whether or not the plaintiff has met her burden of proof.

Eisenhour App., Vol. 4 at 1058–59 (emphasis added). After the jury rendered verdicts in favor of Eisenhour on her First Amendment and equal-protection claims, the defendants moved for judgment as a matter of law. Eisenhour then filed her first motion to disqualify, stating that the emphasized sentence above had established that Judge Waddoups could not fairly preside at further proceedings. Judge Waddoups denied the disqualification motion. He later granted the County's motion for a new trial on the whistleblower claim on the ground that the jury's findings were internally inconsistent (because the jury found that the closure of the Justice Court constituted an adverse action

9

for the purposes of Eisenhour's claim under the state whistleblower act but not for the purposes of her First Amendment retaliation claim), but he further ruled that this inconsistency also required retrying the retaliation claims. Eisenhour then filed her second motion to disqualify, which was denied by Judge Sam.

We see no abuse of discretion in the denial of either motion. The claim of bias here is unusual. Courts regularly see (meritless) claims that a judge must have been biased because the judge ruled against the movant claiming bias. *See Liteky v. United States,* 510 U.S. 540, 555 (1994) ("judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"). Here, in contrast, the comment allegedly displaying bias was uttered in the course of ruling in favor of the movant on a matter that the judge considered to be a close question. That is not the stuff of bias. If the judge really wanted to do what he purportedly thought would make everyone "better off," one would think that he would have directed a verdict against Eisenhour. We are not inclined to reverse because of a comment that appears to be merely a facetious remark that there would be less work for the attorneys and the judge if the jury rendered a verdict against Eisenhour, thereby mooting the motions for directed verdict. Particularly ironic is that the jury did find against Eisenhour on her retaliation claims yet the court ordered a retrial of those claims.

### 2. Evidentiary Rulings During Second Trial

Eisenhour contends that the district court's evidentiary rulings during the second trial, viewed collectively, deprived her of a fair trial. We reject the argument because it is inadequately presented.

The problem with Eisenhour's argument is that she never explains what was wrong with any particular ruling. She merely points to a number of purportedly mistaken evidentiary rulings and notes that the court sustained a much higher percentage of the defendants' objections than of hers. *See* Eisenhour 1st Br. at 23 ("By the undersigned's calculations, the court sustained 127, or 68% of the County's 188 objections at trial, but only 16% of Eisenhour's objections."). We are unwilling to assume, however, that the objections of the opposing parties were equally meritorious. Perhaps the County was simply more careful about limiting its objections to meritorious points. What is utterly absent from Eisenhour's brief is any description of the context of the disputed evidence, a discussion of the arguments by the parties at trial regarding the evidentiary rulings, or the explanation by the court of its rulings; nor does the brief contain citations to authority or other analysis of why the rulings were incorrect. *See* Fed. R. App. P. 28(a)(8)(A) (argument in appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1276 (10th Cir. 2018) (appellant waived argument that documents were inadmissible hearsay because it "offer[ed] no explanation for why [admission of the documents] was erroneous"); *In re Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1114–15 (10th Cir. 2017) (rejecting as inadequately briefed, and thus waived, arguments for which appellant cited no authority). Eisenhour is asking us to do all her work for her on this issue. We decline to take on the responsibility.

### 3. Claims Against Commissioners

11

Eisenhour argues that the district court erred when it granted the commissioners judgment as a matter of law after the close of evidence at the second trial. But "we need not resolve whether a preverdict dismissal of a claim was proper if the jury's verdict on the remaining claims shows that any error in failing to present the dismissed claim to the jury was harmless." *Abbasid, Inc. v. First Nat'l Bank of Santa Fe*, 666 F.3d 691, 696 (10th Cir. 2012). At the second trial the jury did not decide claims against the commissioners, but it did decide those against the County—and found that the County had taken no adverse employment action against Eisenhour. No plausible view could reconcile this finding with a finding that the commissioners were individually liable to Eisenhour with respect to her § 1983 First Amendment claim. Any district-court error here (if there was error) was thus harmless. Because we have found no ground for reversing the judgment in favor of the County, we must also affirm the judgment in favor of the commissioners.

### B.	Adverse Rulings Relating to Claim Against Storey

Although Eisenhour generally prevailed on her claim against Storey, she complains of two adverse rulings by the district court: (1) judgment as a matter of law against her on her claim for economic damages (her loss of wages when the Justice Court closed), and (2) rejection of her claim for punitive damages.

#### 1.	Economic Damages

Eisenhour argues that the district court erred by granting Storey judgment as a matter of law on liability for Eisenhour's lost wages, which resulted from closure of the Justice Court. A court should grant judgment as a matter of law "only when 'a party has

12

been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cox Enters.*, 871 F.3d at 1096 (quoting Fed. R. Civ. P. 50(a)(1)). We review grants of judgment as a matter of law de novo, "drawing all reasonable inferences in favor of the nonmoving party and applying the same standard as [should be] applied in the district court." *Id.*

To be sure, there was evidence that could support finding a chain of causation from the sexual harassment by Storey to the closure of the Justice Court. But Storey is liable only for damages *proximately* caused by his violation of Eisenhour's rights. *See, e.g.*, *Trask v. Franco*, 446 F.3d 1036, 1046–47 (10th Cir. 2006). Proximate causation requires that the harm have been reasonably foreseeable to the wrongdoer, particularly when there has been a superseding cause, such as the Commission's decision to close the court. *See Martinez v. Carson*, 697 F.3d 1252, 1255–56 (10th Cir. 2012); *Trask*, 446 F.3d at 1046–47 (when there is a superseding cause of the harm, there is no liability unless the wrongdoer could have reasonably foreseen the intervening forces); *see also Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1192 (2011) (discussing proximate cause and foreseeability in context of retaliatory-discharge claim).

Although proximate cause is ordinarily a question of fact for the jury, it becomes a question of law for a court to decide when no evidence supports proximate causation. *See Neece v. Internal Revenue Service*, 96 F.3d 460, 464 (10th Cir. 1996). Since Storey did not fire Eisenhour or even close the Justice Court, the issue is whether it was reasonably foreseeable that his misconduct toward Eisenhour would cause the County to

13

close that court, costing her a job.

Someone might note recent events and argue that it would be reasonably foreseeable that an entire enterprise would fail because of sexual harassment by one person. But those events involved numerous victims of egregious conduct over many years. And Eisenhour has not pointed to any enterprise failing for such reasons more than 10 years ago, when Storey engaged in his misconduct. To say that closure of the Justice Court was a consequence of Storey's misconduct that was foreseeable at the time would be sheer speculation, not a reasonable inference.

### 2. Punitive Damages

Eisenhour argues that the district court erred by dismissing her punitive-damages claim against Storey. During the jury-instruction conference the district court ruled that Eisenhour had presented insufficient evidence to support a punitive-damages instruction against any defendant, including Storey.[1] We review de novo a district court's determination of whether enough evidence exists to support a punitive-damages claim. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1120 (10th Cir. 2004).

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *accord Hardeman*, 377 F.3d at 1120. Because "[t]he focus is on the character of the tortfeasor's conduct—whether it is of the sort that

---

[1] Eisenhour does not appeal the district court's decision that there was insufficient evidence to support a punitive-damages claim against the defendants other than Storey.

14

calls for deterrence and punishment over and above that provided by compensatory awards," no "extra showing" is required for punitive damages even "where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages." *Smith*, 461 U.S. at 53–54; *see Hardeman*, 377 F.3d at 1120.

The specific issue in this case is whether there was sufficient evidence that Storey acted with "reckless or callous indifference to the federally protected rights of" Eisenhour. For guidance on the meaning of that phrase, we look to the Supreme Court's opinion in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). Although *Kolstad* concerned an employment-discrimination claim under Title VII, rather than a § 1983 claim, the Supreme Court noted that the pertinent language in Title VII was derived from the opinion in *Smith* and concluded that the same standard applied in both contexts. *See id.* at 535–36; *Swipies v. Kofka*, 419 F.3d 709, 718 (8th Cir. 2005) (applying *Kolstad* in § 1983 context); *Iacobucci v. Boulter*, 193 F.3d 14, 25 n.7 (1st Cir. 1999) (same).

*Kolstad* made two points important to our resolution of this appeal. First, "reckless or callous indifference" requires that the defendant have acted "in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536. In the context of employment discrimination, the Court explained when intentional discrimination may not in itself suffice for liability for punitive damages:

> There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination

15

satisfies a bona fide occupational qualification defense or other statutory exception to liability.

*Id.* at 536–37.

Second, eligibility for punitive damages does not require that the defendant engaged in egregious misconduct. It is the defendant's mental state, not the scope of the harm, that counts. As the Supreme Court stated:

> Egregious misconduct is often associated with the award of punitive damages, but the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. Conduct warranting punitive damages has been characterized as "egregious," for example, *because* of the defendant's mental state. . . . That conduct committed with the specified mental state may be characterized as egregious, however, is not to say that employers must engage in conduct with some independent, "egregious" quality before being subject to a punitive award.

*Id.* at 538.

From this we conclude that for Storey to be eligible for punitive damages, it was not necessary that he engage in any intentional misconduct beyond that required for him to be liable for compensatory damages under § 1983. It *was* necessary, however, for there to be evidence of an additional required mens rea—that he perceived that he was violating Eisenhour's federal rights against sexual discrimination. We therefore turn to the evidence of that element.

Storey asserts on appeal that "there was no evidence presented during the [first] trial that Storey's conduct was motivated by evil motive or reckless indifference to Eisenhour's constitutional right to be free of gender discrimination in the workplace." Storey's 1st Brief at 30. We disagree. There was evidence from which the jury could

16

infer that he knew that his conduct toward Eisenhour constituted prohibited sexual discrimination. First, he was not only a lawyer but a judge. And "[t]he events here took place in [2007 and 2008], long after the law of sexual harassment had become well established by the Supreme Court." *Molnar v. Booth*, 229 F.3d 593, 604 (7th Cir. 2000). Second, Storey had received special repeated training on the subject. As he testified at trial:

> Q. Did you take any sexual harassment training with the County?
>
> A. Yes, I took the normal course over the years of sexual training, sexual harassment training for the County.
>
> Q. What's the normal course?
>
> A. Well, every year they would have an annual training session.

Storey App., Vol. 13 at 3374. The jury could reasonably infer that a judge with such additional training certainly knew that the conduct described by Eisenhour, particularly the physical assaults, constituted unlawful sexual harassment. This was sufficient evidence to require an instruction on punitive damages. It would then be in the discretion of the jury whether to award any.

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision not to present to the jury the issue of punitive damages against Storey and remand for a new trial on that issue. In all other respects, we **AFFIRM** the judgment of the district court.

17-4015, 17-4018 – Eisenhour v. Weber County, et al.

**HARTZ**, **J.**, Circuit Judge, concurring:

I write separately to note that the law-of-the-case doctrine provides a potential alternative ground for affirming the sufficiency of the evidence on Eisenhour's equal-protection claim.

On Eisenhour's prior appeal to this court, we reversed the summary judgment against her on the equal-protection claim, holding that she had provided sufficient evidence to sustain the claim. Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1099 (10th Cir. 2017) (internal quotation marks omitted). In particular, "[a]n appellate court decision on a particular issue, unless vacated or set aside, governs the issue during all later stages of the litigation in the district court and thereafter on any further appeal." *Id*.

Thus, our decision on the summary-judgment issue in the prior appeal could be the law of the case on the judgment-as-a-matter-of-law issue on this appeal. After all, the standard for both motions is whether a jury could infer the elements of the claim from the evidence presented. As the Supreme Court has stated, "[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Products*, *Inc.,* 530 U.S. 133, 150 (2000) (internal quotation marks omitted); *see Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) ("Summary judgment is

inappropriate . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)); *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, 871 F.3d 1093, 1096 (10th Cir. 2017) ("We may grant judgment as a matter of law only when . . . 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' Fed. R. Civ. P. 50(a)(1).").

This does not mean, however, that a party who lost a motion for summary judgment can never be granted judgment as a matter of law on the same issue. The law-of-the-case doctrine is not an "inexorable command." *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 956 (10th Cir. 2009) (internal quotation marks omitted). We have recognized "three exceptions: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Wessel v. City of Albuquerque,* 463 F.3d 1138, 1143 (10th Cir.2006) (internal quotation marks omitted).

It appears to me that none of these exceptions would apply here. But the issue was not raised by Eisenhour. On future appeals in other cases, perhaps one of the parties will invoke this powerful doctrine.